**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **PATRICIA MITCHELL,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Civil Action No. 3:04-CV-0534-BH(R)** |
| **v.** | § | |
| | § | |
| **COMMISSIONER OF SOCIAL SECURITY,** | § | |
| | § | |
| **Defendant.** | § | **Consent Case** |

## MEMORANDUM OPINION AND ORDER

Pursuant to the provisions of Title 28, United States Code, Section 636(c), and an Order of the Court in implementation thereof, subject cause has been transferred to the undersigned United States Magistrate Judge.  Before this Court are *Plaintiff's Motion for Summary Judgment*, filed October 4, 2004, *Commissioner's Motion for Summary Judgment*, filed January 4, 2005, and *Plaintiff's Response to Defendant's Motion for Summary Judgment*, filed February 11, 2005. Having reviewed the evidence of the parties in connection with the pleadings, the undersigned is of the opinion that the final decision of the Commissioner should be **AFFIRMED.**

## I.  BACKGROUND[1]

### A.    *Procedural History*

Patricia Mitchell ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits.  Plaintiff filed an application for disability benefits under Title II of the Social Security Act on March 23, 1998.  (Tr.

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

at 58-60.)  Plaintiff claimed she was disabled due to back pain, radiating to her legs and feet.  (Tr. at 65.)  Plaintiff's application was denied initially and upon reconsideration.  (Tr. at 34-38, 41-44.) Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 45.)  A hearing, at which Plaintiff personally appeared and testified, was held on December 2, 1998.  (Tr. at 324-78.)  On April 25, 2003, the ALJ issued his decision finding Plaintiff not disabled.  (Tr. at 174-84.)  The Appeals Counsel granted Plaintiff's request for review, remanding the case to the ALJ for further proceedings, including addressing treating source opinions and evaluating Plaintiff's subjective complaints.  (Tr. at 192-93.)  On remand, the ALJ held another hearing on September 20, 2002.  (Tr. at 379-447.)  On November 25, 2002, the ALJ issued his decision finding Plaintiff not disabled.  (Tr. at 12-21.)  The Appeals Council denied Plaintiff's request for review, concluding that the information contained in Plaintiff's request for review did not provide a basis for changing the ALJ's decision.   (Tr. at 5-7.)   Thus, the ALJ's decision became the final decision of the Commissioner.  (Tr. at 5.)  Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g) on March 15, 2004.

**B.**     ***Factual History***

      1.      <u>Age, Education, and Work Experience</u>

Plaintiff was born on July 11, 1959.  (Tr. at 334.)  She obtained a GED and earned an associates degree in computer information systems.  *Id.*  She previously worked as a unit secretary, customer service representative, general office clerk, and computer lab assistant.  (Tr. at 426-27)

      2.      <u>Medical Evidence</u>

Plaintiff fell and injured her back and knees on September 11, 1997, while at work.  (Tr. at 137.)  Plaintiff was treated at Presbyterian Hospital and released.  *Id.*  Plaintiff sought additional treatment from Gerald A. Swayze, D.O., on September 24, 1997.  *Id.*  At that time, she complained

of neck pain with stiffness, tightness of the lower back, lower back pain with tingling of the legs and toes, and pain in both knees. *Id*. Examination revealed muscle spasm with pain and tenderness of the cervical, upper thoracic, and lumbar paravertebral muscle masses. Range of motion of the cervical spine and lumbar spine was restricted. *Id*. X-rays revealed Grade II spondylolisthesis at L5, with a 12mm congenital drift and a narrow disc space at L5-S1. (Tr. at 138.) There was also some straightening of the cervical lordotic curve and mild scoliosis. *Id*. Dr. Swayze diagnosed acute cervical and upper thoracic strain syndrome and acute lumbo-sacral strain. *Id*. He also noted the need to rule out lumbar disc injury and aggravation of Plaintiff's pre-existing spondylolisthesis. *Id*. Plaintiff was prescribed analgesic and anti-spasmodic medications and referred for physical therapy. *Id*.

Due to Plaintiff's continued complaints of low back pain and right knee pain, Dr. Swayze ordered an MRI of the right knee and a lumbar MRI. (Tr. at 134-36.) The MRI of the right knee was performed on October 22, 1997, and revealed no significant abnormalities. (Tr. at 136.) The lumbar MRI was performed on December 10, 1997, and showed mild posterior central disc protrusions at L4-L5 and L5-S1. (Tr. at 134.) Additionally, there was evidence of early dehydration and disc desiccation at L3-L4 and L4-L5. *Id*.

Plaintiff was referred by Dr. Swayze to Abass Sekhavat, M.D., an orthopedic surgeon. (Tr. at 156.) When examined on January 14, 1998, Plaintiff stated that she was in constant pain except when laying down. *Id*. She reported that physical therapy, pain medication, and muscle relaxants had not relieved her symptoms. *Id*. Dr. Sekhavat noted that Plaintiff walked with a cane and limped. (Tr. at 157.) Plaintiff had very little range of motion of the back which Dr. Sekhavat opined was due to fear of pain. *Id*. He found Plaintiff to have back sprain, moderate degenerative changes at L4-L5, minimal degenerative changes at L3-L4, and minimal bulge at L4-L5 and L5-S1. *Id*. Dr.

Sekhavat recommended conservative treatment and rehabilitation.  *Id.*

Plaintiff received treatment from Dr. Swayze from September 24, 1997, through July 27, 1999.  (Tr. at 140-48, 172-71, 257-59.)  During that time she was prescribed Darvocet and Soma. *Id.*

On May 20, 1998, Plaintiff was examined by Barry S. Smith, M.D., in connection with her employment long term disability claim.  (Tr. at 307-09.)  Plaintiff reported that she was unable to perform any activities due to pain and that her daughter and husband performed all of the housework.  (Tr. at 307.)  On examination, Plaintiff had a very slow gait pattern and used a cane. (Tr. at 308.)  Plaintiff would only actively do about five degrees of motion of her neck and had limited range of motion of both shoulders.  *Id.*  However, she had painful, but essentially full, passive range of motion in the shoulders and significantly increased passive range of motion in the neck.  *Id.*  Plaintiff had five to ten degrees of range of motion in her back and was unable to stand on either foot or to stand on her toes and heels.  *Id.*  Maneuvers of Plaintiff's hips revealed only minimal movement before she complained of low back pain.  *Id.*  Straight leg raising was positive at forty degrees for posterior thigh pain.  *Id.*  Dr. Smith opined that Plaintiff had chronic pain syndrome with marked somatization and posturing, probably significant reactive depression, and diffuse myofascial pain without evidence for any true localization to a radicular pattern.  *Id.*  Dr. Smith recommended that Plaintiff receive a psychological evaluation to determine whether underlying psychological issues or issues related to pain syndrome were contributing to her condition.  (Tr. at 309.)  Depending on the results of that evaluation, Dr. Smith felt that Plaintiff might benefit from a chronic pain management program.  *Id.*  Due to the diffuse nature of Plaintiff's symptoms, Dr. Smith did not believe further diagnostic testing would assist in making a diagnosis. *Id.*

On July 30, 1998, Dr. Swayze responded to Dr. Smith's recommendation that Plaintiff would benefit from a chronic pain management program.  (Tr. at 170.)  Dr. Swayze believed that such treatment was "fraudulent and totally ineffective."

Plaintiff received a psychological examination on October 7, 1998.  (Tr. at 301-06.)  The examination revealed no evidence of a mental disorder or depression.  (Tr. at 305.)  However, the examiner did note that Plaintiff was preoccupied with pain, which affected her ability to function. *Id.*  With regard to Plaintiff's activities of daily living, the examiner stated that Plaintiff reported she was able to care for her personal hygiene but that she did not perform any housework.  (Tr. at 303.)  Although she had been prescribed exercises by her physician, Plaintiff stated that she did not do them regularly.  *Id.*  Plaintiff usually shopped by mail but reported going grocery shopping once a week.  *Id.*  She spoke on the telephone to friends and family, and occasionally visited them.  *Id.* Plaintiff told the examiner that she attended church, but less frequently than she did earlier in her life.  *Id*.  Plaintiff occasionally went out for dinner and to a movie, but stated that she could not sit up very long.  *Id.*  The examiner diagnosed Plaintiff with Pain Disorder Associated with General Medical Condition.  (Tr. at 305.)  After reviewing the psychological report, Dr. Smith clarified his earlier opinion and stated that he did not believe Plaintiff would benefit from a chronic pain management program.  (Tr. at 300.)

After Dr. Swayze retired, Plaintiff was treated by Ramon D. Garcia, M.D., from November 11, 1999, through January 30, 2002.  (Tr. at 265-286, 384.)  Dr. Garcia continued treating Plaintiff for chronic lower back pain with Darvocet and Soma.  (Tr. at 265-286.)

Plaintiff was examined by Robert A. Goldberg, M.D., a consultative examiner, on October 25, 2001.  (Tr. at 260.)  Plaintiff complained of pain in her low back with radiation and discomfort to her calves.  *Id.*  Additionally, she stated that sometimes her neck, fingers, and toes became numb

and that she frequently had spasms over her body.  *Id.*  Examination revealed no trigger points or muscle spasms in the lumbar or thoracic spine.  (Tr. at 261.)  Dr. Goldberg stated that "[h]er passive back range of motion is probably of normal, limited at that point by her complaint of some discomfort."  *Id.*  Plaintiff was able to perform a normal toe gait, a fair heel gate, and normal tandem gait.  *Id.*  She was able to do half of a squat but was unable or unwilling to hop on either leg.  *Id.*  When sitting, Plaintiff could do straight leg raises to 90 degrees without discomfort, but the Lasegue maneuver produced calf and popliteal fossa discomfort with radiation into the buttocks.  *Id.*  An x-ray of Plaintiff's lumbar spine was generally normal, with generally normal disc space intervals.  (Tr. at 262.)  Dr. Goldberg opined that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds.  (Tr. at 263.  He believed Plaintiff would have no limitations in standing/walking or sitting.  *Id.*  She could occasionally climb, balance, stoop, crouch, kneel, and crawl.  (Tr. at 264.)

3.   Hearing Testimony

a.   First Hearing

Plaintiff's first hearing took place on December 2, 1998.  (Tr. at 324-78.)  The ALJ heard testimony from Plaintiff, her husband, and a vocational expert.  (Tr. at 324.)  Plaintiff was not represented by counsel at the hearing.  (Tr. at 329.)

Plaintiff testified that she obtained an associate's degree in computer information systems.  (Tr. at 334.)  Her past work included work as a unit secretary and as a customer service representative.  (Tr. at 336, 338, 341.)  Plaintiff stated that she injured her back and knee in a fall at work.  (Tr. at 342.)  Plaintiff's knee healed within a year but she testified that her back was worse.  (Tr. at 342-43.)  Plaintiff stated that she was unable to work due to pain in her back and in her legs.  (Tr. at 343.)  Plaintiff took Soma, a muscle relaxant, four times a day and Darvocet as needed.  (Tr. at 344.)  Plaintiff testified that she needed to take the Darvocet daily, sometimes as many as four

times a day.  (Tr. at 345.)  The medication helped somewhat, but the relief did not last.  (Tr. at 345-46.)

Plaintiff stated that although the examining physician found she could lift ten pounds, in reality she felt pain lifting even a gallon of milk.  (Tr. at 348.)  She believed she could lift only five pounds without pain.  (Tr. at 348-49.)  Plaintiff believed she could sit or stand for only twenty or thirty minutes at a time.  (Tr. at 349.)  She was also unable to bend.  (Tr. at 350.)  Plaintiff was prescribed a cane when she injured her knee and continued to use it after her knee recovered because her "legs give out."  (Tr. at 351.)

Usually, Plaintiff spent her day reclining.  (Tr. at 349, 356.)  Plaintiff watched television.  (Tr. at 354, 356.)  Plaintiff usually did not perform any housework, although she occasionally made her bed.  (Tr. at 356-57.)  She did not cook.  (Tr. at 350.)  Plaintiff was able to drive and go visit her brother, but not every day.  (Tr. at 357-58.)  Prior to her injury, Plaintiff exercised on a regular basis, but at the time of the hearing, her exercise was limited to walking around the house.  (Tr. at 361.)  Plaintiff testified that she could not return to her past work because she would need to lay down during the day and because her medications made her less alert and affected her judgment.  (Tr. at 362-63.)

Plaintiff's husband testified that she was in pain all the time.  (Tr. at 364.)  On very rare occasions, Plaintiff would go to the store, but her husband did the vast majority of the shopping.  (Tr. at 364-65.)  They did not attend church as regularly as they had before Plaintiff's injury.  (Tr. at 365.)

The Vocational Expert ("VE") stated that Plaintiff's past relevant work as a customer service representative was sedentary and semiskilled.  (Tr. at 366.)  Plaintiff's work as a unit secretary was semiskilled and medium as performed by Plaintiff.  (Tr. at 366-67.)   The first hypothetical posed

by the ALJ assumed an individual who could lift no more than five pounds, could sit or stand for no more than twenty to thirty minutes, and would require the option to lay down during frequent rest breaks. (Tr. at 368.) The VE testified that such an individual would not be able to perform competitive employment. (Tr. at 369.) The ALJ then changed the hypothetical individual to one who could lift up to ten pounds, could sit for six hours and stand for two hours out of an eight hour day. *Id.* The hypothetical individual could perform a full range of sedentary work but with minimal limitation on her ability to maintain attention and concentration for extended periods. *Id.* The VE answered that such an individual could not perform Plaintiff's past work as she had performed it. *Id.* However, the VE testified that such an individual could perform the jobs of washroom operator, toll press folder and feeder, and final assembler. (Tr. at 370-72.) If the hypothetical individual needed to stand and stretch every hour, the VE stated that she could not perform the job of washroom operator. (Tr. at 372.) Lastly, the ALJ asked the VE to assume an individual who could lift ten pounds occasionally, sit for six hours and stand and walk for two hours out of eight and needed to be able to stand at her own discretion during the course of working. (Tr. at 373.) The VE responded that such an individual could perform Plaintiff's past work as a customer service representative. *Id.*                b.    <u>Second Hearing</u>

After remand, a second hearing was held on September 20, 2002. (Tr. at 379-447.) At the hearing, the ALJ heard testimony from Plaintiff, Plaintiff's husband, and a VE. (Tr. at 380.) Plaintiff was represented by counsel at the hearing. (Tr. at 381.)

Plaintiff testified that she had been in continuous pain since her accident in September 1997. (Tr. at 388.) Even after taking her medication, Plaintiff felt nagging pain. (Tr. at 388-89.) Pain woke her up at night. (Tr. at 389.) Plaintiff stated that she took Soma and Darvocet three to four times a day. (Tr. at 394.) Plaintiff also soaked in a hot tub to relieve her pain. (Tr. at 396.) Sitting

increased her pain.  (Tr. at 400-01.)  Plaintiff stated that she could sit for an hour before her back would be in severe pain.  (Tr. at 403-04, 417.)  She could lift up to ten pounds, but anything heavier caused pain all over her body.  (Tr. at 404-05.)  However, sometimes even the weight of a gallon of milk would cause her pain.  (Tr. at 405.)  She was able to bend over, but with pain.  *Id.*  Plaintiff testified that she could not work more than an hour or two a day because she had difficulty focusing. (Tr. at 415.)

Plaintiff testified that she performed very little housework.  (Tr. at 395.)  She occasionally made her bed or washed a few dishes, but did not perform any vacuuming, sweeping, or mopping. (Tr. at 395-96.)  If she exerted herself one day, she would need a few days to recover.  (Tr. at 396.) When she felt up to it, Plaintiff tried to walk twenty to thirty minutes.  (Tr. at 397.)  During the day she watched television and played a video game.  (Tr. at 399.)  However, Plaintiff's pain and the medication made it difficult for her to focus on the game.  *Id.*  Plaintiff spent most of the day reclining.  (Tr. at 400.)  Plaintiff occasionally drove.  (Tr. at 402.)  She did not take long trips.  *Id.* Plaintiff did go to the movies, but she took her medicine beforehand.  (Tr. at 404.)  Occasionally, Plaintiff went to the store.  (Tr. at 405.)  Plaintiff and her husband went out to pick up meals once or twice a week.  (Tr. at 409, 425.)  Plaintiff's husband prepared most of the meals, but Plaintiff cooked two to three meals out of seven.  (Tr. at 409.)

Plaintiff's husband testified that Plaintiff was an active woman prior to her injury.  (Tr. at 422.)  He stated that Plaintiff was no longer able to walk for long distances and could no longer deal with their active grandchildren.  *Id.*  Plaintiff's husband performed the majority of the household chores.  (Tr. at 423.)   They rarely went out to eat in a restaurant.  (Tr. at 425.)

The VE testified that Plaintiff's past work as a customer service representative was sedentary and skilled, her past work as a unit secretary was light and semiskilled, and her past work as a

general office clerk was sedentary to light and semiskilled. (Tr. at 427.) With respect to her work as a computer lab assistant, the VE testified as follows:

> She was a computer lab assistant at – in a college. And that is sedentary. It can – generally is sedentary and skilled at the seven level. . . . but the closest job that would fit the category of a computer lab assistant would be user support analyst. And that's someone who helps people who are learning the computer to problem-solve and troubleshoot and that kind of thing. I do know because I actually worked . . . where she worked that the computer lab assistants aren't always sitting. It's considered a sedentary job, but they're usually up walking around, checking, you know, with students to see how they're doing. So I would consider it possibly at the light level as opposed to sedentary. Not because of having to lift a lot, but just probably – walking more than two hours a day. Most likely. That's by conjecture. She can change that.

(Tr. at 427-28.) The ALJ questioned the VE further about the walking requirement of the computer lab assistant position and stated that it would be light, as performed by Plaintiff. (Tr. at 428-29.) The VE agreed that the job would be light as performed. (Tr. at 429.) The VE was asked to assume a person of Plaintiff's background who was required to avoid frequent extension of her arms and prolonged flexion of the neck, as well as stooping, bending, lifting, sitting, standing and/or walking for prolonged periods. (Tr. at 429.) The VE opined that such an individual could perform Plaintiff's past work as a computer lab assistant. (Tr. at 430.)

## C.     *ALJ's Findings*

The ALJ issued his decision denying benefits on November 25, 2002. (Tr. at 15-26.) In his findings, he determined that Plaintiff had not engaged in substantial gainful employment since the alleged onset date of disability. (Tr. at 16.) The ALJ determined that Plaintiff's lumbo-sacral strain, lumbar spondylolisthesis, bilateral lumbar radiculopathy, and chronic low back pain were severe impairments. (Tr. at 17.) However, the ALJ concluded that Plaintiff's impairments were not severe enough to meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. *Id.*

In reciting the relevant medical evidence, the ALJ noted an opinion by Dr. Swayze that Plaintiff was unable to work.  (Tr. at 18.)  The ALJ noted that an opinion on the ultimate issue in the cases was not binding.  *Id.*  In addition, the ALJ stated that "Dr. Swayze's report . . . is found to be a report obtained in the context of litigation and thus less persuasive than the objective report obtained in the context of an attempt at vocational rehabilitation."  *Id.*  The ALJ noted that Dr. Swayze based his opinion of total disability on an MRI which showed only "mild disc protrusion at L4-5 and L5-S1, with no effacing of the thecal sac or neural elements at L5-S1 and only mild effacing of the thecal sac at L4-5 without resulting central spinal canal stenosis."  *Id.*

In determining Plaintiff's RFC, the ALJ found that Plaintiff's statements regarding her impairments and ability to work were "not entirely credible or consistent with the evidence of record."  (Tr. at 18.)  In support of this determination, the ALJ noted that "the objective medical evidence does not reveal the imposition of any specific limitation on the claimant's ability to perform work activities."  (Tr. at 19.)  Additionally, the ALJ found Plaintiff's assertions of pain or disability not totally credible

> based on lack of any aggressive medical treatment for her alleged disabling condition over the years, such as attending a pain clinic as recommended by Barry Smith, M.D., and the lack of any clinical findings consistent with the claimed disabling pain.  Further, Dr. Smith diagnosed the claimant with chronic pain syndrome with marked somatization and posturing and indicated, based on a psychological evaluation, the claimant did not appear to have reactive depression or a diffuse myofascial pain problem.

(Tr. at 19.)  The ALJ stated that Plaintiff

> indicated she is able to perform her own personal hygiene, dress herself, performs her own grocery shopping once a week, drives a car, attends church, watches television and listens to music, talks on the phone to friends and relatives, as well as visits them on occasion and lifts and carries up to 10 pounds.

*Id.*  The ALJ concluded that Plaintiff's "daily activities and lifestyle contradict the allegation of the

-11-

inability to maintain any structured activity such as substantial gainful activity." *Id.*

The ALJ determined that Plaintiff retained the RFC to perform the exertional demands of a full range of sedentary work.  (Tr. at 19.)  The ALJ concluded that Plaintiff's RFC would permit her to return to her past relevant work as a computer lab assistant.  (Tr. at 21.)  As a result, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act.  *Id.*

## II.   ANALYSIS

### A.   *Legal Standards*

1.   Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).  Substantial evidence is defined as more than a scintilla, but less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the

determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

    2.    <u>Disability Determination</u>

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

    1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

    2.    An individual who does not have a "severe impairment" will not be found to be disabled.

    3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

    4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

    5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the inquiry, the burden lies with the claimant to prove disability.

*Leggett*, 67 F.3d at 564.  The inquiry terminates if the Commissioner determines at any point during

the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies

his or her burden under the first four steps, the burden shifts to the Commissioner at step five to

show that there is other gainful employment available in the national economy that the claimant is

capable of performing.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).  This burden may

be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert

vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir.

1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive

and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.      Issues for Review**

Plaintiff alleges that substantial evidence does not support the Commissioner's finding that

she was not disabled because:

(1)      The ALJ erred in evaluating her credibility;

(2)      The ALJ erred in discounting the medical opinion of Plaintiff's treating physician;
         and

(3)      There is not substantial evidence to support the finding that Plaintiff retains the
         residual functional capacity to perform her past work.

**C.      Issue One: Plaintiff's Credibility**

Plaintiff asserts that the ALJ failed to properly evaluate her credibility.  (Pl.'s Br. at 3-9.)

In particular, Plaintiff states that the ALJ erred in relying on Plaintiff's failure to attend a pain clinic,

the lack of clinical evidence in support of her subjective allegations of pain, and Plaintiff's daily

activities in finding her allegations incredible.  *Id.*

"Credibility determinations are generally the province of the ALJ and are entitled to

-14-

deference." *Lam v. Apfel*, 2000 WL 354393, *4 (N.D. Tex. Apr. 5, 2000).  Therefore, courts will

reverse an ALJ's credibility determination only if it is "patently wrong." *Jens v. Barnhart*, 347 F.3d

209, 213 (7th Cir. 2003).  Social Security regulations instruct ALJs to conduct a seven-factor

analysis when determining the credibility of a claimant's subjective complaints of pain.  20 C.F.R.

§ 404.1529(c)(3).  The ALJ's "determination or decision must contain specific reasons for the

finding on credibility, supported by the evidence in the case record, and must be sufficiently specific

to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to

the individual's statements and the reasons for that weight."  SSR 96-7p.  "If on [42 U.S.C.] § 405(g)

review the court finds that the ALJ followed the proper procedures and considered the relevant

factors, the ALJ's determination is ordinarily conclusive." *Lechner v. Barnhart*, 321 F. Supp. 2d

1015, 1027 (E.D. Wis. 2004).  However, "since substantive regulations have the force and effect of

law, failure to employ the seven-factor analysis when assessing credibility of subjective complaints

constitutes legal error." *Parker v. Barnhart*, 431 F. Supp. 2d 665, 672 (E.D. Tex. 2006).  "Such an

error warrants a reversal unless harmless error analysis indicates that 'remand would be an idle and

useless formality.'" *Id.*  (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n. 6 (1969)).

In this case, the ALJ provided specific reasons for his credibility determination.  At issue

then, is whether there is substantial evidence to support the bases upon which the ALJ relied in

making the determination.

1.    Plaintiff's failure to attend a pain clinic

The ALJ found Plaintiff's assertions of pain or disability not totally credible in part "based

on lack of any aggressive medical treatment for her alleged disabling condition over the years, such

as attending a pain clinic as recommended by Barry Smith, M.D." (Tr. at 19.)  However, Dr. Smith,

an examining physician for Plaintiff's insurance company, did not actually recommend that Plaintiff

-15-

attend a pain clinic.   Rather, Dr. Smith recommended that Plaintiff receive a psychological evaluation and, depending on the results of that evaluation, Dr. Smith felt that Plaintiff might benefit from a chronic pain management program.   (Tr. at 309.)   After receiving the results of the psychological evaluation, Dr. Smith clarified his earlier opinion and stated that he did not believe Plaintiff would benefit from a chronic pain management program.   (Tr. at 300.)   Additionally, Plaintiff's treating physician, Dr. Swayze opined that Plaintiff would not benefit from a chronic pain management program.   (Tr. at 170.)   It is clear from the record that the ALJ erred in finding that Plaintiff's failure to attend a pain clinic negatively affected her credibility.

2.   Lack of clinical evidence

The ALJ also found Plaintiff to be not credible due to "the lack of any clinical findings consistent with the claimed disabling pain." (Tr. at 19.)  Plaintiff points the Court to evidence in the record where Plaintiff was diagnosed with protruding discs at L4-L5 and L5-S1, early disc dessication at L3-L4 and L4-L5, and clinical lumbar radiculopathy. (Pl.'s Br. at 4.)  However, the ALJ did not dispute the fact that Plaintiff had "lumbo-sacral strain, lumbar spondylolisthesis, bilateral lumbar radiculopathy and chronic low back pain."  (Tr. at 16.)  Rather, his opinion as to Plaintiff's credibility in this area was limited to noting that the clinical findings were not consistent with her claims of *disabling* pain resulting from her impairments.  (Tr. at 19.)  A review of the objective clinical evidence in the record shows that an MRI performed on December 10, 1997, showed "early disc dehydration/dessication at L3-L4 and L4-L5 . . . mild 2mm. posterior central disc protrusion with disc material coming in contact with the thecal sac without effacing it or the neural elements." (Tr. at 154.)  Dr. Sekhavat, a treating orthopedic surgeon, examined Plaintiff, reviewed the MRI results, and opined that Plaintiff had back sprain, moderate degenerative changes at L4-L5, minimal degenerative changes at L3-L4, and minimal bulge at L4-L5 and L5-S1.  (Tr. at 157.)  *Id.*

An x-ray of Plaintiff's lumbar spine performed on October 25, 2001, was generally normal, with generally normal disc space intervals.  (Tr. at 262.)  Because the only test results in the record are indicative of mild to moderate changes in Plaintiff's lumbar spine, the Court concludes that there is substantial evidence to support the ALJ's conclusion that clinical findings were not consistent with Plaintiff's claims of disabling pain.

3.    Plaintiff's daily activities

As additional support for his credibility finding, the ALJ cited Plaintiff's daily activities. He stated that Plaintiff

indicated she is able to perform her own personal hygiene, dress herself, performs her own grocery shopping once a week, drives a car, attends church, watches television and listens to music, talks on the phone to friends and relatives, as well as visits them on occasion and lifts and carries up to 10 pounds.

(Tr. at 19.)  He also noted that Plaintiff

indicated that she is able to walk 20 to 30 minutes, lift up to 10 pounds, sit for 1 hour and bend, push and pull with pain.  The claimant testified that she is able to do light housework and goes out to eat and attends the movies with her husband twice a week.  In addition, she is able to drive.

(Tr. at 18.)  Plaintiff takes issue with several of these listed activities.  (Pl.'s Br. at 5-9.)  With respect to the statement that Plaintiff goes grocery shopping every week, the ALJ cited to Plaintiff's report of her daily activities to the psychological examiner.  (Tr. at 19.)  Therein it states that Plaintiff reported that she "does do her grocery shopping one time a week." (Tr. at 303.)  At the first hearing before the ALJ, Plaintiff testified that she went to the store on vary rare occasions.  (Tr. at 364-65.)  At the second hearing she stated that she went to the store occasionally.  (Tr. at 405.) Accordingly, there is substantial evidence in the record to find that Plaintiff did go grocery shopping, even to the extent of once a week.

The ALJ stated that Plaintiff attended church.  (Tr. at 19.)  Plaintiff reported to the

psychological examiner that she attended church, but less frequently than she did earlier in her life. (Tr. at 303.)  At the second hearing, Plaintiff's husband stated that did not attend church as frequently as they used to, and that they had not been to church in a long time.  (Tr. at 365.) Because there is evidence in the record indicating that Plaintiff did attend church, albeit not regularly, there is no error in the ALJ's finding.

The ALJ noted that Plaintiff could lift and carry up to ten pounds.  (Tr. at 19.)  At the first hearing, Plaintiff stated that although the examining physician found she could lift ten pounds, in reality she felt pain lifting even a gallon of milk.  (Tr. at 348.)  She believed she could lift only five pounds without pain.  (Tr. at 348-49.)  At the second hearing, Plaintiff testified that she "can't lift anything that's over 10 pounds or whatever.  And if it's 10 pounds I may can lift it, but I usually – anything that's real heavy I get pain, where it just hurts all over my body. . . ."  (Tr. at 404-05.) However, sometimes even the weight of a gallon of milk would cause her pain.  (Tr. at 405.) Additionally, Plaintiff reported to the psychological examiner that she could lift no more than ten pounds.  (Tr. at 303.)  As there is evidence in the record indicating that Plaintiff could lift up to ten pounds, there is no error.

In his decision, the ALJ states that Plaintiff testified that she was able to do light housework. (Tr. at 18.)  At the second hearing, Plaintiff testified that she occasionally made her bed or washed a few dishes, but did not perform any vacuuming, sweeping, or mopping.  (Tr. at 395-96.)  Plaintiff also stated that she prepared two to three meals out of seven.  (Tr. at 409.)  Although the Court has found no definition for "light housework," it does not appear that such limited household activity as that performed by Plaintiff would qualify as "light housework."  At minimum, the ALJ should have set forth that housework which he believed to amount to "light."  In making a credibility determination, the ALJ's decision "must be sufficiently specific to make clear to the individual and

to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Manney v. Barnhart*, 320 F. Supp. 2d 681, 696-97 (N.D. Ill. 2004) (quoting *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). For this reason, the Court finds that the ALJ erred in finding that Plaintiff testified to performing light housework.

Plaintiff complains of the ALJ's finding that she went out to eat and attended the movies twice a week. (Pl.'s Br. at 7.) When asked about her activities of daily living, the following exchange took place:

> Plaintiff:  We go out to eat sometimes too.
>
> ALJ:  About how often?
>
> Plaintiff:  I guess some – I guess at least – well, sometime we go out once or twice a week sometimes.

(Tr. at 409.) Plaintiff's husband clarified her statement by testifying that

> [W]hen we go out, I'm talking about going and picking up food and coming back home. I'm not talking about going out . . . and sitting in a restaurant. We don't do that too often. She never really feels like it a lot of times, so we have done it, but not too often.

(Tr. at 425.) Plaintiff also testified that she and her husband had been attending movies but that she took her pain pills and muscle relaxers beforehand. (Tr. at 404.) Although Plaintiff's testimony was that she went out to eat once or twice a week, it is clear from her husband's testimony that in reality they did not go out to eat at a restaurant quite that often. So, although the ALJ was correct in finding that Plaintiff did go out to eat and to the movies, he erred as to the frequency.

The ALJ found that Plaintiff could drive. (Tr. at 19.) Plaintiff acknowledges that she is able to drive, but claims the ALJ's finding was in error because she testified that she did not usually drive and that when she did drive she went only short distances. (Pl.'s Br. at 7-8.) However, as admitted by Plaintiff in her brief, she could drive and therefore, the ALJ's finding was not in error.

Lastly, Plaintiff complains of the ALJ's finding that Plaintiff visited with friends and family. (Pl.'s Br. at 8.)  Plaintiff asserts that the finding was in error because she and her husband testified that she did not have company very often.  *Id.*  However, at the first hearing, Plaintiff testified that she was able to drive and go visit her brother. (Tr. at 357-58.)  At the second hearing, Plaintiff and her husband testified that they occasionally had company at the house and that Plaintiff talked on the phone. (Tr. at 399, 422-23.)  Additionally, when Plaintiff spoke to the psychological examiner, she stated that she spoke on the telephone to friends and family, and occasionally visited them.  (Tr. at 303.)  Thus, the ALJ's finding that Plaintiff visited with friends and family was not in error.

In conclusion, the ALJ erred when making his credibility finding in finding that Plaintiff failed to attend a pain clinic despite a doctor's recommendation that she do so, in finding that Plaintiff testified to the ability to perform light housework, and in finding that Plaintiff went out to eat twice a week.  As noted above, such error is legal error requiring reversal unless the error was harmless.  *Parker*, 431 F. Supp. 2d at 672.   To show that the error was not harmless, Plaintiff must demonstrate prejudice "by showing that, but for the error, the ALJ might have reached a different conclusion."  *Id.* (citing *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000);  *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995);  *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984)).  In this case, the ALJ cited ample other evidence in support of his finding that Plaintiff's testimony as to the disabling nature of her impairments was not fully credible.  *See Garcia v. Apfel*, 2000 WL 959568, *1 (5th Cir. June 8, 2000) (finding no reversible error when other evidence supported the ALJ's credibility finding even though the ALJ did err in finding that Plaintiff did her own housework). Plaintiff has not shown that but for the errors noted above the outcome of her case would have been different.  For this reason, the Court concludes that substantial evidence supports the ALJ's credibility determination.

**D.**     ***Issue Two: Weight Accorded Treating Physician Opinion***

Plaintiff alleges that the ALJ erred in failing to give controlling weight to the opinion of  Dr. Swayze, a treating physician.  (Pl.'s Br. at 9-10.)  Plaintiff claims that the ALJ erred in finding that Dr. Swayze's report was obtained in the context of litigation and therefore less persuasive.  *Id.*

An ALJ is required to evaluate every medical opinion received and set forth the weight given those opinions.  20 C.F.R. § 404.1527(d); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000). "A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (citing 20 C.F.R. § 404.1527(d)(2)). However, if good cause exists, an ALJ may give a treating physician's opinions little or no weight. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).  "Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id*. at 456.  Thus, "[t]he treating physician's opinions are not conclusive." *Id*. at 455.  "Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, 'the ALJ has the sole responsibility for determining a claimant's disability status.'" *Martinez*, 64 F.2d at 176 (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).  "[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Martinez*, 64 F.2d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).

The Fifth Circuit in *Newton* held that "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the

-21-

opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20. C.F.R. § 404.1527(d)(2)." Thus, before deciding not to give any weight to a treating physician's opinion, an ALJ must consider: (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician. *Newton*, 209 F.3d at 456 (citing 20 C.F.R. § 1527(d)(2)). If the ALJ fails to consider the requisite criteria, the case must be remanded. *Locke v. Massanari*, 285 F. Supp.2d 784, 795 (S.D. Tex. 2001). However, the court expressly excluded from the scope of *Newton* cases "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" and cases in which "the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Newton*, 209 F.3d at 458. Thus, "*Newton* is limited to circumstances where the administrative law judge summarily rejects the opinions of a claimant's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant." *Contreras v. Massanari*, 2001 WL 520815, at *4 (N.D. Tex. May 14, 2001); *see also Newton*, 209 F.3d at 458; *Pedraza v. Barnhart*, 2003 WL 22231292, at *5 (W.D. Tex. Sept. 15, 2003).

In the instant case, the ALJ noted an opinion by Dr. Swayze that Plaintiff was unable to work. (Tr. at 18.) The ALJ correctly noted that an opinion on the ultimate issue in the case was not binding. *Id. See Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990) (noting that although a treating physician's opinions should be accorded considerable weight in determining disability, the

ALJ has the sole responsibility for determining disability status).  In addition, the ALJ stated that "Dr. Swayze's report . . . is found to be a report obtained in the context of litigation and thus less persuasive than the objective report obtained in the context of an attempt at vocational rehabilitation." (Tr.at 18.)  The ALJ noted that Dr. Swayze based his opinion of total disability on an MRI which showed only "mild disc protrusion at L4-5 and L5-S1, with no effacing of the thecal sac or neural elements at L5-S1 and only mild effacing of the thecal sac at L4-5 without resulting central spinal canal stenosis."  *Id.*  It is clear from the ALJ's decision that he did not reject the opinions of Dr. Swayze *in toto*.  Rather, he gave less weight to Dr. Swayze's report, which was prepared in connection with Plaintiff's dispute with her long term disability carrier and which contained an opinion as to the ultimate issue of Plaintiff's disability.  (Tr. at 18.)  Notably, the ALJ did not reject Dr. Swayze's diagnoses of Plaintiff's impairments.  *Id.*  Additionally, the ALJ cited to objective clinical evidence obtained by Dr. Swayze to support the ALJ's determination that Dr. Swayze's opinion as to Plaintiff's disability warranted less weight.  *Id.*

For these reasons, the Court finds that the ALJ did not discount the medical opinions of Plaintiff's treating physician and did not err in giving less weight to Dr. Swayze's opinion as to the ultimate issue of Plaintiff's disability.

### E.        *Issue Three: Plaintiff's Ability to Perform Her Past Work*

Lastly, Plaintiff asserts that the ALJ erred in finding that she retained the RFC to perform her past work as a computer lab assistant.  (Pl.'s Br. at 10-14.)  Plaintiff notes that the ALJ found that she retained the RFC to perform a full range of sedentary jobs and that the VE testified that the job of computer lab assistant was light as performed by Plaintiff.  *Id.*

Social Security Ruling  82-61 states that "[u]nder sections 404.1520(e) and 416.920(e) of the regulations, a claimant will be found to be 'not disabled' when it is determined that he or she

retains the RFC to perform: 1) The actual functional demands and job duties of a particular past

relevant job; or 2) The functional demands and job duties of the occupation as generally required

by employers throughout the national economy." The Dictionary of Occupation Titles states that

the job of user support analyst, the job identified by the VE as most similar to Plaintiff's past work

as a computer lab assistant, is sedentary work and requires "[e]xerting up to 10 pounds of force

occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible

amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to

lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work

involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs

are sedentary if walking and standing are required only occasionally and all other sedentary criteria

are met." DICTIONARY OF OCCUPATIONAL TITLES 032.262-010. With respect to Plaintiff's work

as a computer lab assistant, the VE testified as follows:

> She was a computer lab assistant at – in a college. And that is sedentary. It can –
> generally is sedentary and skilled at the seven level. . . . but the closest job that
> would fit the category of a computer lab assistant would be user support analyst.
> And that's someone who helps people who are learning the computer to problem-
> solve and troubleshoot and that kind of thing. I do know because I actually worked
> . . . where she worked that the computer lab assistants aren't always sitting. It's
> considered a sedentary job, but they're usually up walking around, checking, you
> know, with students to see how they're doing. So I would consider it possibly at the
> light level as opposed to sedentary. Not because of having to lift a lot, but just
> probably – walking more than two hours a day. Most likely. That's by conjecture.
> She can change that.

(Tr. at 427-28.) The ALJ questioned Plaintiff further about the walking requirement of the computer

lab assistant position and stated that it would be light, as performed by Plaintiff. (Tr. at 428-29.)

The VE agreed that the job would be light as performed. (Tr. at 429.) The VE was asked to assume

a person of Plaintiff's background who was required to avoid frequent extension of her arms and

prolonged flexion of the neck, as well as stooping, bending, lifting, sitting, standing and/or walking

for prolonged periods.  (Tr. at 429.)  The VE opined that such an individual could perform Plaintiff's past work as a computer lab assistant.  (Tr. at 430.)

Although Plaintiff may have difficulty performing the duties of computer lab assistant in her past place of employment because of frequent walking, "[t]he mere inability of a claimant to perform certain 'requirements of his past job does not mean that he is unable to perform past relevant work as that phrase is used in the regulations;' rather, the Commissioner may also consider the description of the claimant's past work as such work is generally performed in the national economy." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Jones v. Bowen*, 829 F.2d 524, 527 n.2 (5th Cir. 1987)).  The job of user support analyst, that identified by the VE as the DOT listing closest to the category of computer lab assistant, is a sedentary job as generally performed in the national economy, requiring only occasional walking.  DICTIONARY OF OCCUPATIONAL TITLES 032.262-010.  Additionally, the VE testified that the walking requirement of Plaintiff's past work could be changed to accommodate her limitations.  (Tr. at 428.)  Thus, even though the ALJ found Plaintiff limited to sedentary work, she would still be able to perform her past work as a computer lab assistant/user support analyst, as it is performed in the national economy.  Accordingly, the ALJ's determination that Plaintiff could return to her past work is consistent with his assessment of Plaintiff's RFC.

### III.   CONCLUSION

For the foregoing reasons, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff was not disabled for purposes of the Social Security Act.  Accordingly, the final decision of the Commissioner is wholly **AFFIRMED**.

**SO ORDERED,** this 6th day of September, 2006.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE